# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 24-2096T
(Filed: May 28, 2026)

|  |  |
|---|---|
| **NORTHEAST HEALTH SERVICES, LLC**, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| **UNITED STATES**, | ) |
| | ) |
| *Defendant.* | ) |
| | ) |

*Christopher N. Moran* (argued), Venable LLP, Baltimore, MD, for plaintiff. *Theresa Clardy LaFazia*, Venable LLP, Los Angeles, CA, Of Counsel.

*Anthony M. Cognasi* (argued), Trial Attorney, Tax Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brett A. Shumate*, Assistant Attorney General; *Joshua Wu*, Deputy Assistant Attorney General; and *Jason E. Bergmann*, Assistant Director, and *Eric J. Smith*, Trial Attorney, Tax Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER

**BONILLA, Judge**.

This COVID-19–related tax refund claim presents issues of first impression in this Circuit. Plaintiff Northeast Health Services, LLC (NEHS) claims a nearly $5 million tax refund for the first three quarters of 2021, attributed to the Employee Retention Credit (ERC) under section 2301 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, 134 Stat. 281, 347–51 (2020) (codified as amended at 26 U.S.C. § 3134). Pending before the Court are the parties' cross-motions for summary judgment under Rule 56(a) of the Rules of the United States Court of Federal Claims (RCFC). Specifically, the parties seek to resolve the issue of liability, with NEHS asserting eligible employer status and, conversely, the government arguing that NEHS was exempted from the cited COVID-19–related orders and directives or, alternatively, that the healthcare provider's operations were

not fully or partially suspended "due to" a qualifying governmental order.  For the reasons discussed below, NEHS's motion is denied, and the government's dispositive cross-motion is granted.

## BACKGROUND

NEHS is a healthcare provider that offers mental health care services—including counseling, psychotherapy, psychiatric medication management, and interventional psychiatry—through outpatient mental health clinics located throughout the Commonwealth of Massachusetts.[1]  Its clinics are licensed and regulated as healthcare facilities by the Massachusetts Department of Public Health (DPH),[2] which is one of eleven state governmental agencies that comprise the Massachusetts Executive Office of Health and Human Services (EOHHS).[3]  Prior to March 2020, NEHS provided its services exclusively in person at nine clinics located throughout Massachusetts.[4]

On March 10, 2020, then–Governor of Massachusetts Charles D. Baker Jr. declared a state of emergency in response to the COVID-19 pandemic, explaining that he would "from time to time issue recommendations, directives, and orders as circumstances may require."  ECF 21-1 at 17.  Pursuant to that declaration, the governor issued COVID-19 Order No. 13 on March 23, 2020, titled "Order Assuring Continued Operation of Essential Services in the Commonwealth, Closing Certain Workplaces, and Prohibiting Gatherings of More Than 10 People."  *Id.* at 19–23. The order designated certain workforces and businesses—including "physicians, . . . psychologists, . . . nurses and assistants, . . . [and] . . . other providers of mental and behavioral health care," *id.* at 25 (Exhibit A)—as "COVID-19 Essential Services."  *Id.* at 20.  Order No. 13 "urged [COVID-19 Essential Services] to continue operations during the state of emergency, but to do so with allowance for social distancing protocols consistent with guidance provided by [DPH]."  *Id.*  Businesses "that d[id] not provide COVID-19 Essential Services" were told that they "shall close their

---

[1] *See About Us*, NE. HEALTH SERVS., *available at* https://perma.cc/3YP3-N58S.

[2] The Code of Massachusetts Regulations sets forth standards for the maintenance and operation of clinics and defines a clinic, in relevant part, as "[a]ny entity, however organized, whether conducted for profit or not for profit, [that] is advertised, announced, established, or maintained for the purpose of providing[, among other things,] mental health services."  105 MASS. CODE REGS. 140.020 (2025).

[3] *See generally Executive Office of Health and Human Services*, MASS.GOV, *available at* https://perma.cc/5JUM-SM6X.

[4] In its motion for partial summary judgment, NEHS asserts that, "[p]rior to the onset of the COVID-19 pandemic in March 2020, [it] had *ten* clinic locations in Massachusetts."  ECF 21 at 7 (emphasis added). One of the clinics, however, never commenced operations.  *See* ECF 23-2 at 32–33 ("[A]t the time of my coming to the company, there were ten physical locations, one of which was new and to open. That site never opened for a variety of reasons. It was going to be doing a little bit more of an addiction-focused service. That was a particularly in-person service. We just never launched that line, and so that site— we let the lease go."); ECF 28 at 7–8.

physical workplaces and facilities . . ." and were "encouraged to continue operations where they [we]re able to operate through remote means . . . ." *Id.* at 20–21.

NEHS submits that it interpreted "mental and behavioral health care" within the meaning of Order No. 13's carveout for "COVID-19 Essential Services," *id.* at 25, as referring only to "hospital and inpatient services, not outpatient mental health clinics such as NEHS's clinics." ECF 21 at 8 (citing ECF 21-1 at 6 ¶ 9). NEHS therefore "closed its outpatient clinics and ceased operations for approximately three weeks." *Id.* (citing ECF 21-1 at 6 ¶ 10). NEHS maintains that, although it was able to implement telehealth capabilities in late April 2020, those early-pandemic sessions were limited and often consisted of brief telephonic or virtual patient check-ins, rather than full-length therapy sessions.

The restrictions imposed by Order No. 13 were extended three times on March 31, 2020 (COVID-19 Order No. 21), April 28, 2020 (COVID-19 Order No. 30), and May 15, 2020 (COVID-19 Order No. 32). Then, on May 18, 2020, then-Governor Baker issued COVID-19 Order No. 33, which instituted a four-phase business reopening plan and delegated "specific authority to [DPH to] promulgate directives, regulations, and guidance to implement and enforce the terms of th[e] Order . . . ."[5] ECF 21-1 at 35–43. Violations of Order No. 33—or any directives, regulations, or guidance issued pursuant thereto—were punishable by civil fines of up to $300 per violation and enforceable via injunctive relief. Of note, the governor's directive exempted "[a]ny health care facility or provider licensed by [DPH]." *Id.* at 41. The same day, DPH issued its own guidance, outlining instances in which health care providers could begin implementing "urgent elective invasive procedures."[6] *Id.* at 45. Consistent with Order No. 33, DPH and EOHHS proceeded to issue different stages of reopening guidance between May 2020 and March 2021. The guidance applied to healthcare providers that offered services for non-emergency procedures prior to the COVID-19 pandemic but were unable to perform those procedures during the early days of the pandemic due to restrictions on in-person care.

The DPH and EOHHS guidance placed numerous restrictions on the healthcare providers required to follow it. For example, DPH required providers to prioritize telehealth where appropriate. *See id.* at 78 (explaining, for phase one, that "[h]ealth care providers should . . . continue to provide services via telehealth to the greatest extent possible when clinically appropriate, while also recognizing that telehealth may not be feasible or clinically appropriate for all patients"), 92 (similar

---

[5] Order No. 33 limited the rulemaking authority delegated to DPH to "businesses, organizations, and workplaces subject to the sanitary code established pursuant to section 127A of chapter 111 of the General Laws and where DPH otherwise has existing regulatory authority." ECF 21-1 at 40.

[6] The May 18, 2020 DPH order authorized health care providers to "implement procedures published by [DPH] regarding the scheduling and performance of . . . urgent elective invasive procedures," provided the health care providers "submit[] an attestation to the state certifying that they meet [applicable] clinical, capacity, safety standards, and governance requirements . . . ." ECF 21-1 at 45.

for phase two), 103 (similar for phase three), 113 (similar for phase four).  Each phase of DPH's four-phase plan also required providers to implement procedures designed to reduce the spread of disease where possible, including, but not limited to: providing personal protective equipment and other essential supplies, *see, e.g.*, *id.* at 78 (phase one), 94 (phase two), 107 (phase three), 111 (phase four); limiting employees to those "necessary to complete the service or procedure for the patient," *id.* at 79 (phase one), 94 (phase two), 107 (phase three), 111 (phase four); promoting social distancing, *id.* at 80 (phase one), 94 (phase two), 107 (phase three), 110 (phase four); and establishing plans to clean and disinfect common and procedural areas, *id.* at 80 (phase one), 94–95 (phase two), 107 (phase three), 112 (phase four).

On May 28, 2021, then-Governor Baker—citing "sustained improvements in the public health data" and "the development and effective distribution to the public of safe, highly effective, and free COVID-19 vaccines"—rescinded the four-phase business reopening plan, effective May 29, 2021.  *See id.* at 115–17.  Health care providers, however, continued to be subject to DPH guidance on limiting the spread of COVID-19.  *See, e.g.*, *id.* at 123–26 ("COVID-19 Guidance for Health Care Providers, effective June 14, 2021"); *id.* at 128–31 (update to "COVID-19 Guidance for Health Care Providers," effective "July 2, 2021").

NEHS asserts that "the executive orders, DPH reopening orders, DPH phased guidance, inspection suspensions, and enforcement mechanisms significantly disrupted NEHS's operations and limited its ability to provide in-person outpatient mental health services throughout 2020 and 2021."  ECF 21 at 13.  In support, NEHS provides a list of financial and logistical challenges it experienced while responding to the COVID-19 pandemic and attempting to comply with state directives and guidance.  First, NEHS details the difficulties experienced in providing consistent and reliable services throughout the COVID-19 pandemic.  The healthcare provider reports that its clinics were subject to capacity limits and periodic closures during 2020 and 2021 due to COVID-19 exposures.  NEHS also notes that it struggled to treat certain patient populations, including children, while implementing newly required telehealth treatment methods.

Second, NEHS outlines its inability to implement specialized treatment modalities during the later stages of the pandemic.  In May 2021, NEHS acquired a West Virginia–based provider of Transcranial Magnetic Stimulation (TMS) and Spravato (esketamine),[7] both of which require in-person administration and post-administration observation and, therefore, cannot be administered via telehealth. Although NEHS intended to introduce these treatments at its clinics, it was unable

---

[7] TMS is a non-invasive antidepressant procedure, and Spravato is a nasal spray.  *See Transcranial Magnetic Stimulation*, MAYO CLINIC (Apr. 7, 2023), *available at* https://perma.cc/MJ4T-QKN5; *What is Spravato® (esketamine) CIII Nasal Spray?*, SPRAVATO (ESKETAMINE) (Dec. 2025), *available at* https://perma.cc/Y76Z-5B9D.

to do so in 2020 and 2021 due to the clinic opening delays and limitations on in-person treatment.[8]

Third, NEHS describes disruptions to its ability to maintain and supervise a consistent and qualified workforce.  For certain services, NEHS previously relied on employees who could not lawfully practice (or bill) without in-person supervision by licensed clinicians, including physician assistants and certified nurse practitioners.[9] Restrictions and safety constraints designed to combat the spread of COVID-19, however, complicated or otherwise prevented NEHS from properly supervising and, consequently, utilizing non-licensed practitioners.  Additionally, NEHS experienced delays in licensing, onboarding, and credentialing clinicians due to "COVID-related disruptions affecting licensing boards, insurers, and administrative processing." ECF 21-1 at 140–41.  NEHS also maintains that school closures and the unavailability of childcare services caused some of its employees to stay home from work, preventing them from scheduling patient visits at pre-pandemic rates.[10]

Fourth, NEHS recounts the operational impact it suffered on account of its unexpected transition to telehealth.  Prior to February 2021, NEHS did not have a universal telehealth platform, and its telehealth capability varied by clinic and provider.  The transition reportedly caused NEHS to "incur[] additional expenses to implement and maintain telehealth, including per-clinician telehealth licenses and staff training."  *Id.* at 141.  NEHS also points to increased complexities and

---

[8] NEHS does not explain how it would have introduced the treatments in 2020, before it acquired the West Virginia–based provider.  *See* ECF 23 at 9 ("[I]n May 2021, NEHS acquired a West Virginia– based company to help implement two higher-acuity interventional psychiatric services in its Massachusetts clinics, [TMS] and Spravato® . . . .  However, NEHS did not begin offering these services in a meaningful way until 2022.").  An NEHS employee represented that "[i]n 2020 . . . there was no TMS at NEHS. We introduced it in 2021."  ECF 23-2 at 22.  *But see id.* ("You should think of TMS as something that was delayed and affected because it was—it was just not the right time to roll it out.").

[9] *See, e.g.*, 267 MASS. CODE REGS. § 3.02(2)(b)(4) (2020) ("An unlicensed individual may perform any of the functions or services specified in [267 MASS. CODE REGS. § 3.02(2)(a)] pursuant to a delegation of medical services by a duly licensed physician only if: . . . [t]he unlicensed individual performs the function or service in question in accordance with accepted standards of medical practice and under the direct, personal, on-site supervision of the licensed physician making that delegation of medical services . . . .").  NEHS also notes that "[t]he various boards within . . . DPH's Bureau of Health Professions Licensure" and "[i]nsurance payers, including Medicare, Medicaid, and commercial payers, also require that clinicians who are not independently licensed be supervised by a licensed clinician . . . ."  ECF 21-1 at 11–12.

[10] *See* ECF 21-1 at 132–34 (March 15, 2020 "Order Temporarily Closing All Public and Private Elementary and Secondary Schools"); *id.* at 135–38 (March 18, 2020 "Order Temporarily Closing All Child Care Programs and Authorizing the Temporary Creation and Operation of Emergency Child Care Programs").  During 2020 and 2021, NEHS employed approximately 200 to 250 psychiatric and therapy professionals, including psychiatrists, nurse practitioners, physician assistants, and social workers.  NEHS explains that "many [of its clinicians and therapists] have child and family obligations" and were affected by the school closures.  *Id.* at 12.

administrative burdens associated with telehealth billing, which delayed revenue collection and increased claim denials. Explaining the financial impact of the implementation and utilization of telehealth services, NEHS also points to aberrations in its employees' usage of billing codes that corresponded with a decrease in its expected reimbursement amount per visit: prior to March 2020, only approximately two percent of patient visits used the billing code for a 30-minute appointment, but between January 2021 and September 2021, that rate jumped to approximately eight to ten percent.[11]

Finally, NEHS reports that it missed revenue opportunities attributable to delayed clinic openings. Massachusetts regulations require clinics to receive approval of construction plans and pass an in-person DPH inspection before constructing and opening new clinics. *See* 105 MASS. CODE REGS. § 140.103(C), (E) (detailing "prior approvals" and other steps to follow "[i]n the case of new construction of a clinic . . . ."). DPH reportedly suspended in-person inspections for new clinic licensures at the start of the COVID-19 pandemic and only resumed in-person inspections during late 2020 and 2021 at a limited capacity. As a result, notwithstanding NEHS's plans to open seven new clinics and reopen another, the healthcare provider only opened one new clinic in 2021.[12]

The government counters that NEHS is not entitled to the ERC because, as a COVID-19 Essential Service, the healthcare provider was exempted from the state-imposed restrictions. The government further avers that NEHS's operations were not "fully or partially suspended" as that term is defined under the relevant portion of the CARES Act and, in any case, that any claimed business interruptions were not "due to" a qualifying government order. Regarding NEHS's conversion to telehealth, the government notes that, when NEHS first contracted with a telehealth implementation service in October 2020,[13] the corresponding rollout was "straightforward" because many of its clinicians had been independently using the same telehealth service since May 2020. ECF 23 at 12; *accord* ECF 23-2 at 14–15; ECF 23-3 at 11. The government also points to deposition testimony indicating that the administrative burden associated with NEHS's transition to telehealth was, at most, minimal. ECF 23 at 13; *see* ECF 23-2 at 21 (noting that the COVID-19 emergency order "suspended the in-person requirement for initiation of psychotropic

---

[11] The 30-minute billing code reimburses clinics at a materially lower rate than the 45-minute or 60-minute billing codes.

[12] By comparison, NEHS opened six new clinics in 2022, thirteen new clinics in 2023, and "approximately" twelve new clinics in 2024. ECF 21-1 at 143 ¶ 23.

[13] As discussed above, NEHS asserts that it "entered into an enterprise-wide telehealth agreement in February 2021." ECF 21-1 at 141 ¶ 13. The different dates—October 2020 versus February 2021—are not inconsistent. The parties appear to have chosen them based on the scope of NEHS's agreement with the telehealth service. In October 2020, the agreement was "for a per clinician, per month fee to make it available and have them enrolled," ECF 23-2 at 15, while in February 2021, the agreement was "enterprise-wide," ECF 21-1 at 141.

6

medications," making it possible for NEHS to initiate psychotropic medications via telehealth); ECF 23-3 at 9 (explaining NEHS did not have the administrative burden of collecting co-pays for a period of time extending "several months into Covid"). Finally, the government interprets the increased percentage of appointments that utilized the 30-minute billing code differently than NEHS does, noting that, while NEHS did see an increase in 30-minute appointments, NEHS maintained roughly the same amount of 45-minute and 60-minute appointments.

Notwithstanding NEHS's claimed operational challenges, the government points to certain metrics indicating that the healthcare provider's business grew or otherwise remained relatively consistent throughout the pandemic. In the first three quarters of 2021, NEHS gained a net of seventy-four employees, *compare* ECF 23-6 at 2 (315 compensated employees in Q1), *with id.* at 10 (389 compensated employees in Q3), and increased its gross profit per quarter from slightly under $5 million in Q1 to just over $5 million in Q3. Additionally, while it lost about ten percent of its patients to school closures,[14] NEHS did not otherwise suspend or cancel any contracts during the pandemic.

Against this backdrop, NEHS filed three Forms 941-X (Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund) on or about January 19, 2024, for the employment tax quarters ending March 31, 2021 (Q1), June 30, 2021 (Q2), and September 30, 2021 (Q3). In each amended return, NEHS explained it was seeking "[t]o retroactively claim the [ERC]" under Section 2301 of the CARES Act.[15] ECF 1-2 at 6, 11, 16; *accord* ECF 1 at 1. As recently explained by this Court:

> The CARES Act was one of several laws that Congress passed in the spring of 2020 to address the economic impacts of COVID-19. The CARES Act included the [ERC], a refundable tax credit that subsidized employers who were forced to close or suspend operations due to COVID-19–related public health orders. Using the ERC, eligible employers can reduce the amount paid in employment taxes by 70% of the amount paid to employees during the pandemic-related shutdowns.

[14] NEHS "had contracts with some schools, and those services stopped . . . . [C]linicians would go on-site, and . . . services were scheduled during the school day. That ended . . . ." ECF 23-2 at 27.

[15] Originally, the ERC applied exclusively to tax year 2020. *See* § 2301(m), 134 Stat. at 351 ("This section shall only apply to wages paid after March 12, 2020, and before January 1, 2021."). Congress extended it twice: first, through the Taxpayer Certainty and Disaster Tax Relief Act of 2020, Pub. L. No. 116-260, 134 Stat. 1182, 3062 (amending Section 2301(m) of the CARES Act to extend the ERC to wages paid until July 1, 2021); and second, through the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4, 182 (amending the CARES Act to extend the ERC to wages paid until January 1, 2022). Congress later amended the CARES Act to eliminate the availability of the ERC after the third quarter of 2021 for most businesses (including NEHS). *See* Infrastructure Investment and Jobs Act, Pub. L. No. 117-58, 135 Stat. 429, 1341 (2021) (amending the CARES Act to terminate the ERC on October 1, 2021 for eligible employers that do not qualify as recovery startup businesses).

> If the credit exceeds the amount of employment taxes paid, employers can claim the difference as a cash refund . . . .

*Gravenstein 116, LLC v. United States*, 180 Fed. Cl. 292, 294 (2026) (footnote and additional internal citations omitted) (citing I.R.C. § 3134).  NEHS filed this action after the Internal Revenue Service (IRS) failed to process the requested refunds within six months.[16]

## DISCUSSION

### I.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine" dispute exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material" facts, in turn, are those "that might affect the outcome of the suit." *Id.*  In deciding motions for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Coop. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed. Cir. 2007) (citing *Anderson*, 477 U.S. at 248).  Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . ." *Matsushita*, 475 U.S. at 587.

### II.    Eligible Employer

The parties' principal disagreement is whether NEHS qualifies as an "eligible employer" under the ERC.  The CARES Act defines "eligible employer," in part, as "any employer":

---

[16] Under 26 U.S.C. § 6532(a)(1), "[n]o suit or proceeding under section 7422(a) for the recovery of any internal revenue tax, penalty, or other sum, shall be begun before the expiration of 6 months from the date of filing the claim required under such section unless the Secretary renders a decision thereon within that time . . . ."

(i) which was carrying on a trade or business during the calendar quarter for which the credit is determined . . . , and

(ii) with respect to any calendar quarter, for which—

(I) the operation of the trade or business described in clause (i) is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to [COVID-19], [or]

(II) the gross receipts . . . of such employer for such calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019 . . . .

26 U.S.C. § 3134(c)(2)(A).  NEHS was undisputedly "carrying on a trade or business during" the quarters in question.  The parties, however, dispute whether NEHS satisfies clause (ii)(I) of the definition—hereinafter, the "suspension-of-business prong"—which itself contains three discrete statutory requirements: that the business was "fully or partially suspended during the calendar quarter"; that there existed "orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to [COVID-19]"; and that the suspension of business was caused by (i.e., "due to") a qualifying order.  26 U.S.C. § 3134(c)(2)(A)(ii)(I).  To prevail on summary judgment, the government need only demonstrate that there is no genuine dispute that NEHS fails to meet at least one of the three requirements of the suspension-of-business prong.  *See, e.g.*, *In re JSmith Civ., LLC*, 674 B.R. 207, 218 (Bankr. E.D.N.C. 2025) (granting summary judgment to government where there was no genuine issue as to whether plaintiff was exempted from the government orders in question), *appeal docketed*, No. 25-513 (E.D.N.C. Aug. 22, 2025).

Because the CARES Act does not define the relevant terms or elaborate on the scope of the requisite causal relationship, the Court must determine the meaning of those requirements.[17]  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400

---

[17] The Court is aware of two cases aside from this one where federal courts have interpreted the meaning of "eligible employer" under § 2301 of the CARES Act: *In re JSmith*, 674 B.R. 207, and *JPM Rest., LLC v. United States*, No. 24-357, 2026 WL 561147 (E.D. Tenn. Feb. 27, 2026), *notice of appeal filed*, No. 24-357 (E.D. Tenn. Apr. 1, 2026), Dkt. No. 88.  In a third case, the United States District Court for the District of Arizona considered whether Internal Revenue Bulletin 2021-11—published by the Internal Revenue Service (IRS) to provide guidance on its interpretation of the ERC's eligibility requirements, *see infra* note 20—"was a mere interpretive document . . . or improper legislative rulemaking that should have been subject to the [Administrative Procedure Act (APA)]'s notice-and-comment procedures." *Stenson Tamaddon LLC v. IRS*, No. 24-1123, 2025 WL 1725942, at *2 (D. Ariz. June 20, 2025), *appeal docketed*, No. 25-4217 (9th Cir. July 9, 2025).

(2024).  In so doing, the Court may look to "the judgment of the Executive Branch" to "inform [its] inquiry," but it may not delegate the task of statutory interpretation or otherwise defer to the relevant agency's independent analysis.  *Id.* at 388, 412–13 (explaining that the weight of an agency's "'interpretations and opinions' . . . would 'depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944))).

A.      Qualifying Government Orders

Although the government concedes that the "COVID-19 Orders issued by the Governor of the Commonwealth of Massachusetts are governmental orders,"[18] ECF 23 at 15–16, it argues the follow-on DPH guidance is not an "order" within the meaning of the CARES Act.  To resolve this issue, the Court must first determine what "order" means in this context.  Because the CARES Act does not define "order," *see* 26 U.S.C. § 3134(c)(2)(A), the Court presumes Congress intended to give that word its plain and ordinary meaning.  *Gumpenberger v. Wilkie*, 973 F.3d 1379, 1382 (Fed. Cir. 2020) (quoting *Gazelle v. Shulkin*, 868 F.3d 1006, 1010–11 (Fed. Cir. 2017)).

An "order" is generally considered a "command, direction, or instruction" or a "written direction or command delivered by a government official . . . ."  *Order*, BLACK'S LAW DICTIONARY (12th ed. 2024); *accord Order*, MERRIAM-WEBSTER, *available at* https://perma.cc/CNK3-ZMW4 ("specific rule, regulation, or authoritative direction: command").  "An 'order' should be understood in contrast to a 'recommendation,' which Black's Law Dictionary defines as 1. 'A specific piece of advice about what to do, esp. when given officially' and 2. 'A suggestion that someone should choose a particular thing or person that one thinks particularly good or meritorious.'"  *In re JSmith*, 674 B.R. at 214–15 (quoting *Recommendation*, BLACK'S LAW DICTIONARY (12th ed. 2024)).  Both an "order" and a "recommendation" endorse a specific course of conduct; the difference lies in whether the endorsement is enforceable.  *See id.* at 215 ("The key distinction is that 'an "order" must be compulsory.'" (citing *Lawrence Gen. Hosp. v. Cont'l Cas. Co.*, 90 F.4th 593, 604 (1st Cir. 2024))).[19]  Thus, to qualify as an "order" under the suspension-of-business

---

[18] As discussed *infra*, the fact that a directive qualifies as an "order" under the suspension-of-business prong does not necessarily require the Court to interpret every provision in the directive to be mandatory, particularly where the directive qualifies some provisions with permissive language (e.g., "urge" or "should") and other provisions with mandatory language (e.g., "shall" or "must").

[19] The parties do not dispute whether an order must be compulsory.  *Compare* ECF 21 at 17 (NEHS: "[']An "order" must be compulsory.' . . . [T]he focus is on whether the government has the power to enforce the order." (citations omitted)), *with* ECF 23 at 18 (Government: "The directive must be compulsory." (citations omitted)); *but see* ECF 24 at 16 (NEHS: noting that, in defining "order," "what matters is whether 'compliance . . . was not optional under any practical understanding of that term,'" in contrast to "[d]efendant's narrower standard, which requires a directive to be 'compulsory,' meaning 'mandatory' or 'enforced' . . . ." (citing *Lawrence Gen. Hosp.*, 90 F.4th at 605)).

prong, a government directive must, as a whole, carry enforcement authority or otherwise have the ability to compel a certain course of conduct through the imposition of "binding requirements or repercussions for noncompliance."[20] *Id.* (quoting *Baxter Senior Living, LLC v. Zurich Am. Ins.*, No. 22-44, 2025 WL 1207151, at \*6 (D. Alaska Apr. 25, 2025)); *cf. Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000) ("If an agency acts as if a document issued at headquarters is controlling in the field, if it treats the document in the same manner as it treats a legislative rule, if it bases enforcement actions on the policies or interpretations formulated in the document, if it leads private parties or State permitting authorities to believe that it will declare permits invalid unless they comply with the terms of the document, then the agency's document is for all practical purposes 'binding.'" (citation omitted)); *cf., e.g.*, *Lawrence Gen. Hosp.*, 90 F.4th at 605 (holding—in the insurance context—that DPH guidance issued during the COVID-19 pandemic and applicable to inpatient hospitals were orders because the hospital's "'choice' to comply with the stated conditions or forgo the ability to treat 'the vast majority of its patients' for an indefinite period is no choice at all").

---

[20] In guidance published on March 15, 2021, the IRS explained its understanding of the phrase "orders from an appropriate governmental authority" as follows:

> Orders, proclamations, or decrees from the Federal government or any State or local government may be taken into account by an employer as "orders from an appropriate governmental authority" only if they limit "commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to [COVID-19]" *and relate to the suspension of an employer's operation of its trade or business. . . .* Whether orders, proclamations or decrees are governmental orders is determined without regard to the level of enforcement of the governmental order.
>
> . . . [T]he declaration of a state of emergency . . . that limits commerce, travel, or group meetings, but does so in a manner that does not relate to the suspension of an employer's operation of its trade or business does not rise to the level of a governmental order for purposes of the employer's determination of its eligibility for the employee retention credit.

*Internal Revenue Bulletin: 2021-11*, IRS (Mar. 15, 2021), *available at* https://perma.cc/4R4K-G2HU (emphasis added). The Court declines to follow the IRS's construction—that, to qualify as an "order," a government directive must "relate to the suspension of an employer's operation of its trade or business"—for three reasons. First, those words are not present in the statute. *Cf. Lamie v. U.S. Tr.*, 540 U.S. 526, 538 (2004) (rejecting construction that "would have [the Court] read an absent word into the statute" because it would "result 'not [in] a construction of [the] statute, but, in effect, an enlargement of it by the court, so that what was omitted . . . may be included within its scope.'" (alterations in original) (quoting *Iselin v. United States*, 270 U.S. 245, 251 (1926))). Second, the IRS's construction appears intended to limit the extent to which businesses can qualify for the ERC by reading a causal relationship between the "order" and the qualifying suspension into the phrase "orders from an appropriate governmental authority." On this point, a causation requirement is much more readily read into the words, "due to," than the words, "orders from an appropriate governmental authority." Third, the government conceded at oral argument that the IRS's understanding of a qualifying order "does go a little bit farther than Congress intended." ECF 28 at 44.

11

The DPH guidance promulgated pursuant to Order Nos. 13 and 33 qualifies as an "order" under the suspension-of-business prong.[21]   Order Nos. 13 and 33 authorized DPH to issue compulsory guidance: they directed DPH to "issue guidance . . . to implement the[ir] terms" and explained that "[v]iolation of . . . the DPH Guidance may result in a criminal penalty . . . or a civil fine . . . ." ECF 21-1 at 21–22 (Order No. 13); *see id.* at 40–41 (Order No. 33).  In other words, if businesses failed to comply with mandatory directives in DPH guidance issued in accordance with the governor's directives, they risked enforcement action.  For the same reason, the DPH guidance promulgated pursuant to the May 28, 2021 modified declaration of public health emergency likely qualifies as an "order" under the suspension-of-business prong as well.[22]  The May 28, 2021 declaration contained language suggesting that DPH could, if necessary, issue compulsory orders, *see id.* at 121 ("[DPH] . . . may rely on this declaration . . . to *mandate* special measures to protect higher risk populations or to effectuate continued surveillance of COVID-19 in the Commonwealth . . . ." (emphasis added)).  To the extent businesses failed to comply with mandatory directives contained in that guidance, they similarly risked civil penalties, criminal penalties, and loss of their clinic licenses.[23]

### B.    Causation

Having established that at least some directives cited by NEHS qualify as "orders" under the suspension-of-business prong, the Court turns to whether NEHS suffered a full or partial suspension "due to" the qualifying orders.  NEHS asserts

---

[21] For clarity, this includes the DPH order "regarding the scheduling and performance of urgent and elective invasive procedures," ECF 21-1 at 44–45, the EOHHS "reopening approach" guidance, *id.* at 46–69, the May 18, 2020 EOHHS memorandum regarding elective procedures, *id.* at 70–73, and the DPH phase-in implementation guidance, *id.* at 74–113.

[22] For clarity, this includes the June 14, 2021 DPH guidance, ECF 21-1 at 122–26, and the July 2, 2021 DPH guidance, *id.* at 127–131.

[23] As discussed *infra*, for the purposes of considering whether an employer qualified for the ERC, an analysis of the extent to which each of the individual directives in the DPH guidance were mandatory is better addressed when determining whether those individual directives caused NEHS's allegedly qualifying suspensions (i.e., whether the allegedly qualifying suspensions were "due to" the qualifying orders).  Under the suspension-of-business prong, a business can satisfy the "orders from an appropriate governmental authority" requirement by pointing to a directive that contained compulsory instructions or otherwise had the authority to issue compulsory instructions.  Whether those directives exercised that authority and actually did issue compulsory instructions meant to require (i.e., factually and proximately cause) a business to suspend its operations is better addressed under the separate "due to" requirement.  If the Court addressed whether the individual directives contained in the DPH guidance were mandatory under the "order" requirement, then it would risk conflating the "order" requirement with the separate "due to" requirement.  *Cf. JPM Rest.*, 2026 WL 561147, at *4–5 (discussing "order" and "due to" as separate requirements).  In any case, even if the "due to" requirement and the "order" requirement were indistinct—as IRS Bulletin 2021-11 suggests, *see supra* note 20—NEHS would still fail to show that a reasonable factfinder could find in its favor because, as discussed *infra*, the relevant directives either exempted NEHS from compliance or implied that compliance was voluntary.

that the qualifying orders required it to modify the administration of its services, prevented it from expanding its business, and caused it to face operational disruptions. While the orders may have contributed to NEHS's struggles during the pandemic, they did not proximately cause any suspensions NEHS may have endured.

Even assuming NEHS suffered a qualifying full or partial suspension of its operations during the pandemic, it must still show that the suspension was "due to" a qualifying order.[24] NEHS argues that the suspension-of-business prong's "due to" prerequisite "requires only but-for causation . . . ." ECF 24 at 28. Courts have grappled with the meaning of "due to" and characterized it as an ambiguous phrase, with definitions ranging from but-for cause (or contributing factor), to proximate cause, to even sole cause. *See Easom v. US Well Servs., Inc.*, 37 F.4th 238, 245 n.2 (5th Cir. 2022) (collecting cases for the proposition "that the phrase, 'due to' is ambiguous"); *U.S. Postal Serv. v. Postal Regul. Comm'n*, 640 F.3d 1263, 1268 (D.C. Cir. 2011) ("[T]he phrase 'due to' is ambiguous[]" because it "has been given a broad variety of meanings in the law ranging from sole and proximate cause at one end of the spectrum to contributing cause at the other." (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999))). The debate typically centers on whether and to what extent "due to" incorporates a causal relationship beyond but-for causation. *See, e.g.*, *Kimber*, 196 F.3d at 1100 ("[Plaintiff-appellant] claims that 'due to' requires that the mental condition be the sole cause of the disability before benefits can be limited. We disagree. . . . Requiring a 'significant' relationship between the condition and the disability is a rational interpretation."); *Penland v. Metro. Life Ins. Co.*, No. 24-1772, 2025 WL 1672861, at *3 (4th Cir. June 13, 2025) ("[Plaintiff-appellant] believes that the limitation provision only takes effect if limited conditions are the sole cause of a claimant's disability. But . . . the ordinary meaning of 'due to' is 'because of,' which, in turn, 'connotes a but-for causation standard.'" (citation omitted)); *Adams v. Director, OWCP*, 886 F.2d 818, 820 (6th Cir. 1989) ("The only

---

[24] The parties dispute whether a reasonable factfinder could conclude that NEHS suffered a qualifying suspension. *See* ECF 23 at 20–25 ("Even assuming that NEHS's pandemic-era operational changes were caused by government order, they did not result in a 'partial suspension' of their business."). But their disputes concern facts that can reasonably be interpreted to support more than one conclusion. *Cf. Ferring B.V. v. Allergan, Inc.*, 980 F.3d 841, 857 (Fed. Cir. 2020) (vacating and remanding grant of summary judgment "in view of the varying reasonable interpretations of the [relevant] correspondence . . . ."). Take, for example, the parties' dispute over the import of the fact that, throughout the tax quarters in question, the number of 30-minute appointments increased in comparison to the number of 45- and 60-minute appointments. NEHS asserts that this fact reflects an increased "difficulty in engaging patients via telehealth," proves that telehealth caused NEHS to face "shorter session lengths," and directly caused NEHS to face "reduced . . . reimbursement[s] per visit." ECF 21 at 24. The government counters that the same fact "show[s] that NEHS was able to continue comparable operations in the quarters at issue." ECF 23 at 21. Both interpretations are reasonable, and rational factfinders can likely disagree over whether the increase in 30-minute appointments supports a finding that NEHS suffered a full or partial suspension during the periods in question. The Court need not decide this issue, however, because—as discussed *infra*—NEHS has not shown that a reasonable factfinder could conclude that any full or partial suspension it suffered would have been "due to" a qualifying order.

issue in dispute on this petition to review, therefore, is whether [petitioner] is totally disabled 'due to' pneumoconiosis. More specifically, the narrow question presented concerns the degree of causation necessary . . . ."); *New York v. U.S. Dep't of Lab.*, 477 F. Supp. 3d 1, 12 (S.D.N.Y. 2020) ("[The agency] is correct, of course, that the traditional meaning of 'because' (and 'due to') implies a but-for causal relationship. But to say that these terms usually connote but-for causation is not to say that they unambiguously do." (citation omitted)).  The only consistent throughline in these cases is that the meaning of "due to" is, in large part, context dependent.  *See, e.g.*, *U.S. Postal Serv.*, 640 F.3d at 1268 (remanding matter to determine "which meaning of 'due to' the Congress intended"); *Kimber*, 196 F.3d at 1100 ("When a plan administrator is given authority to interpret the plan language, and more than one interpretation is rational, the administrator can choose any rational alternative." (citation omitted)); *see also Burrage v. United States*, 571 U.S. 204, 212 (2014) ("*Where there is no textual or contextual indication to the contrary*, courts regularly read phrases like 'results from' [or 'because of'] to require but-for causality." (emphasis added)).

Here, context requires proximate causation.  Interpreting "due to" to require only but-for causation would not conform to the broader statutory scheme to which the ERC contributed and through which Congress provided economic relief during the pandemic.  Importantly, the ERC "is a 'presumption-out' statute, where everyone starts outside of eligibility for the stated relief, and claimants must show why they fit within and satisfy applicable statutory definitions to get 'in' and qualify for the relief."  *In re JSmith*, 674 B.R. at 213.  Were the Court to interpret the suspension-of-business prong to require but-for causation without a proximate causation requirement, "[l]engthy causal chains that could arise from a but-for test . . . would risk turning the ERC into a presumption-*in* statute."  *JPM Rest.*, 2026 WL 561147, at *5 (emphasis added).

Moreover, the CARES Act already provides broad employment tax relief to businesses that suffered significant economic loss during the pandemic—regardless of what caused the loss—through clause (ii)(II) of the "eligible employer" definition (hereinafter, the "decline-in-receipts prong").  *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II) (allowing business to qualify as an "eligible employer" by showing that its "gross receipts . . . for [a qualifying] calendar quarter are less than 80 percent of the gross receipts of such employer for the same calendar quarter in calendar year 2019").  Congress—through its utilization of disjunctive qualification prongs—expressed an intent to provide employment tax relief to businesses that *either* suffered quantifiably significant losses that were generally attributable to the pandemic (through the decline-in-receipts prong) *or* were forced by the government to shut their doors to the public (through the suspension-of-business prong).  To be clear, there is conceivable—and permissible—overlap between the two: a business forced to shut its doors to the public could be expected to suffer a significant decline in revenue.  But one prong should not be construed so as to practically subsume the other.  Interpreting "due to" in the suspension-of-business prong to merely require but-for causation would allow

businesses to point to a qualifying government order, list operational difficulties incidentally related to the qualifying government order (but more directly attributable to the pandemic as a whole), and collect the ERC on that basis— effectively rendering the decline-in-receipts prong superfluous.[25]  An interpretation that permits one qualification requirement to supersede an alternative qualification requirement must be rejected.  *See Yates v. United States*, 574 U.S. 528, 543 (2015) ("resist[ing]" interpretation of a statute "that would render superfluous an entire provision passed in proximity as part of the same Act." (citation omitted)).

NEHS asserts that, as a remedial statute, the CARES Act should be construed broadly.[26]  *See* ECF 24 at 8 (citing *Consumers Power Co. v. Comm'r of Internal Revenue*, 89 T.C. 710, 722 (1987) ("remedial nature" of a statute "justifies a broad construction of the statutory language to effectuate its purpose")); *accord Miller v. Robertson*, 266 U.S. 243, 248 (1924) ("This provision is highly remedial and should be liberally construed to effect the purposes of Congress and to give remedy in all cases intended to be covered." (citations omitted)).  The interpretive canon NEHS relies on, though—that statutory language in remedial legislation should be construed broadly—has been aptly described as "one of the least persuasive of the canons" and "useless":

---

[25] This interpretation would be particularly problematic where, as here, Congress expressly includes an easily identifiable, bright-line limit on the availability of the more-general relief.  *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(II) (decline-in-receipts prong requiring businesses to realize gross receipts more than 20% lower than gross receipts in the same calendar quarter in 2019).  Through the decline-in-receipts prong, Congress expressed an intent to limit general pandemic-related relief to businesses with a specific, easily identifiable quantum of economic loss.  Interpreting the suspension-of-business prong to effectively allow businesses to receive general pandemic-related relief without the requisite economic loss—indeed, even where the business experienced an economic *gain*—would ignore the limit Congress intended to place on that type of relief.

[26] The parties dispute whether the CARES Act is a remedial statute.  *Compare* ECF 24 at 8–13 ("The CARES Act is remedial legislation entitled to broad construction[.]"), *with* ECF 25 at 5–8 ("The CARES Act and its successors were not remedial statutes.").  The Court need not weigh in on this debate.  Even if the CARES Act is a remedial statute, it would not be susceptible to an interpretation that would entitle more businesses to the ERC than Congress intended on the basis that it was "designed to correct an existing oversight in the law, redress an existing grievance, introduce regulations conducive to the public good, or . . . reform or extend existing rights."  *Karissa B. v. O'Malley*, 733 F. Supp. 3d 57, 60 n.5 (D.R.I. 2024) (quoting *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 633–34 (E.D. Mich. 2017)).  As discussed *infra*,

> [N]o legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice—and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law.

*Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987) (per curiam) (emphasis in original).

> There is no presumption that when a legislature legislates against some abuse . . . , it means to resolve all difficult questions in favor of liability, thus disregarding every value other than that of providing remedies for injuries and every interest other than that of prospective victims. Remedial statutes[,] like other statutes[,] are typically compromises, and a court would upset the compromise if it nudged such a statute closer to the victim side of the line than the words and history and other indications of the statute's meaning pointed.

*Bushendorf v. Freightliner Corp.*, 13 F.3d 1024, 1026 (7th Cir. 1993) (quoting *Cont. Courier Servs., Inc. v. Rsch. & Special Programs Admin.*, 924 F.2d 112, 115 (7th Cir. 1991) ("An agency cannot treat a statute as authorizing an indefinite march in a single direction.")). In any case, even assuming this canon should be given any weight, it "appears to be most often applied to the remedies created, not the parties permitted to invoke the statute." *Collinsgru v. Palmyra Bd. of Educ.*, 161 F.3d 225, 232 (3d Cir. 1998) (emphasis added) (citation omitted) (citing *Miller*, 266 U.S. at 248), *abrogated on other grounds by Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007). Here, NEHS mistakenly attempts to use this canon to adjust the limits Congress placed on which businesses were permitted to invoke the ERC. This misplaced use of an unreliable canon must be rejected.

In advocating for an expansive reading of the suspension-of-business prong, NEHS also relies on the CARES Act's legislative history. Specifically, NEHS posits that when Congress amended the ERC's qualification requirements by adding available tax quarters, increasing the amount of the credit, and removing barriers to qualification, it expressed an intent to expand the availability of the ERC. Upon that premise, NEHS asserts that the Court should keep Congress's expansive intent in mind while interpreting the meaning of the suspension-of-business prong. This line of reasoning is similarly unavailing. The methods Congress used to expand the ERC's availability had nothing to do with the suspension-of-business prong. Indeed, the fact that Congress removed other barriers to qualification but did not change the language of the suspension-of-business prong equally supports the riposte: by leaving the suspension-of-business prong untouched, Congress evidenced an intent *not* to expand or otherwise alter the suspension-of-business prong's eligibility requirements. *Cf. Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613–14 (1991) (rejecting suggested interpretation, in part because the Court "would expect to find some expression of [Congress's] intent [to adopt that interpretation] in the legislative history." (citing *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 600–01 (1980) (Rehnquist, J., dissenting))).

Finally, NEHS argues that a comparison to the decline-in-receipts prong is unavailing because "the two prongs serve different purposes and reach different employers" and, consequently, "neither renders the other superfluous." ECF 24 at 21. Indeed, as explained *supra*, the two prongs *do* serve different purposes and reach different employers. But NEHS's proposed construction would elide those

differences. The practical result of NEHS's reading would be to broaden the suspension-of-business prong such that employers could virtually always rely on it and would almost never have to rely on the decline-in-receipts prong. It is more reasonable to analogize the relationship between the two prongs to a Venn diagram, where some employers may satisfy both prongs, but many satisfy only one or the other. NEHS's interpretation of "due to"—allowing for an employer to utilize attenuated causal chains to qualify under the suspension-of-business prong—would practically convert that Venn diagram into a pair of concentric circles, where the universe of employers that qualify for the suspension-of-business prong would envelope the universe of employers that qualify for the decline-in-receipts prong. *Cf. JPM Rest.*, 2026 WL 561147, at \*5 ("The breadth of other relief available in the same Act suggests that Congress did not intend the ERC to provide the same expansive relief that could arise from a mere factual causation requirement."). The Court must resist adopting that interpretation. *See Yates*, 574 U.S. at 543. Accordingly, entitlement to the ERC under the suspension-of-business prong is limited to businesses that can show that a qualifying governmental order was both the factual and proximate cause of a full or partial suspension.[27]

Having determined the meaning of "due to" in the suspension-of-business prong, the Court is left to evaluate whether any of the qualifying orders factually and proximately caused the suspensions NEHS claims it suffered. As mentioned, NEHS describes three categories of suspensions that were apparently "due to" qualifying government orders: first, disruption to its delivery of mental health services; second, interference with its plans to open new clinics; and third, miscellaneous operational difficulties related to telehealth, billing, and staffing. A close look at the allegedly qualifying suspensions, however, shows that they were not proximately caused by any of the qualifying orders because the orders generally exempted mental and behavior health providers, did not compel NEHS to follow their directives, and did not induce the reported disruptions to NEHS's business operations that were more accurately attributable to "general pandemic conditions," *In re JSmith*, 674 B.R. at 218.

For the first category of suspensions, NEHS argues that the disruptions were "due to" (1) Order Nos. 13 and 33, (2) the EOHHS guidance and DPH phase-in implementation guidance promulgated under Order No. 33, and (3) the DPH guidance promulgated under the May 28, 2021 modified declaration of public health emergency. NEHS submits that those qualifying orders forced NEHS to close its

---

[27] Other courts that have considered the meaning of "due to" in the suspension-of-business prong have come to similar conclusions. *See In re JSmith*, 674 B.R. at 215, 218 ("[T]he suspension must be 'due to,' in other words, because of the order. . . . [W]hile there is no doubt various delays, quarantines, sicknesses, and other disruptions occurred, general pandemic conditions caused those closures, not shut down orders."); *JPM Rest.*, 2026 WL 561147, at \*5 ("'[D]ue to' requires both factual and proximate causation—meaning that the order must have been the 'but-for' cause and a foreseeable cause of the full or partial shutdown.").

17

doors and, later, transition to or otherwise prioritize telehealth.  The orders, however, did not force NEHS to do anything.  Order Nos. 13 and 33 exempted NEHS from complying with their directives and the follow-on DPH and EOHHS guidance.  Although Order No. 13 required certain businesses and organizations to temporarily close their physical workspaces and facilities, it expressly exempted those that provided "COVID-19 Essential Services," which included "providers of mental and behavioral health care."[28]  ECF 21-1 at 25.  Given NEHS's self-description as a commercial operation "in the trade or business of providing quality mental health care," such as "counseling and therapy, psychiatry, and medication management," ECF 1 at 3 ¶ 11, NEHS was among the COVID-19 Essential Services exempted from Order No. 13.  The same holds for Order No. 33, which expressly exempted "[a]ny health care facility or provider licensed by [DPH]" from the requirements listed in and guidance issued under that order.  ECF 21-1 at 41.  As a DPH-licensed clinic, NEHS was not required to comply with Order No. 33 or any DPH guidance promulgated thereunder.[29]

---

[28] Businesses providing "COVID-19 Essential Services" were "*urged* to continue operations during the state of emergency, but to do so with allowance for social distancing protocols consistent with [DPH] guidance . . . ."  ECF 21-1 at 20 (emphasis added).  NEHS does not reference this portion of Order No. 13 in its briefs, instead arguing that it was compelled to follow the order and the follow-on DPH guidance because it was *not* a "COVID-19 Essential Service."  But even if NEHS understood it was a "COVID-19 Essential Service," this portion of Order No. 13 would not have proximately caused NEHS's disruptions because it merely encouraged—rather than required—NEHS to follow "social distancing protocols."  Although "urge" more often than not "suggest[s] an impelling beyond mere persuasion," *United States v. Dellinger*, 472 F.2d 340, 362 (7th Cir. 1972), when read in the context of Order No. 13, it "mean[s] little more than an effort at persuasion . . . ," *id.* at 361.  Importantly, Order No. 13 is riddled with requirements that are expressly mandatory, as made evident through its use of the word "shall."  *E.g.* ECF 21-1 at 20 ("[E]stablishments that offer food or beverages to the public *shall* not permit on-premises consumption of food or beverages." (emphasis added)).  Through the repeated use of the word "shall"—which "is mandatory and leaves no room for discretion," *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1364 (Fed. Cir. 2010)—Order No. 13 manifested an intent to impose mandatory requirements through consistent, unambiguous language.  The fact that businesses providing "COVID-19 Essential Services" were comparatively "urged"—and not told that they "shall"—allow for "social distancing protocols" indicates that Order No. 13 intended for the word "urged" to imply persuasion, rather than compulsion.  The Court "refrain[s] from concluding here that the differing language in the two [sentences] has the same meaning in each."  *Rusello v. United States*, 464 U.S. 16, 23 (1983).  To the extent NEHS complied with the portion of Order No. 13 that "urged" it to allow for social distancing protocols, it did so voluntarily.  As discussed *infra*, an action taken voluntarily is not an action that is proximately caused by (i.e., "due to") a qualifying government order in this context.

[29] Order No. 33 also directed businesses previously designated as "COVID-19 Essential Service[s] . . . to comply with and certify [their] compliance with any COVID-19 workplace safety rule issued pursuant to this Order or with the public notice provisions specified above."  ECF 21-1 at 39.  That said, Order No. 33's express carveout of health care facilities licensed by the DPH—one of many services designated as a "COVID-19 Essential Service" by Order No. 13—supplants that requirement as to NEHS.  NEHS does not offer any compelling reason to think that Order No. 33's carveout for DPH-licensed facilities is inapplicable.

NEHS represents that it "interpreted the designation of 'mental and behavioral health services' in . . . Order No. 13 as referring to hospital and inpatient services, not outpatient mental health clinics such as NEHS's clinics." ECF 21 at 8. But Order No. 13 makes no such distinction. In fact, Order No. 13 suggests the opposite: it expressly lists "[c]omprehensive [o]utpatient rehabilitation" as an example of "[w]orkers in other medical facilities," which it also designated as "COVID-19 Essential Services." ECF 21-1 at 25. The only support proffered by NEHS for the inpatient/outpatient distinction is a PowerPoint slide published by EOHHS, titled "Current State: Three Categories of Services Within HHS," which contains "no[n-]exhaustive" lists of "services currently operating," "delayed / deferred services," and "services delivered remotely / via tele[health]." ECF 21-1 at 50. The slide lists "outpatient behavioral health" among the "services delivered remotely / via tele[health]," *id.*, but an EOHHS PowerPoint slide documenting a contemporaneous state of affairs is of minimal probative value to the question of what the governor's order means.

NEHS alternatively argues that, even if Order No. 13 designated NEHS a "COVID-19 Essential Service," such a designation would not carry the day because the suspension-of-business prong is not limited to businesses deemed non-essential by qualifying orders. *See* ECF 24 at 13–14 (noting the suspension-of-business prong uses the words "any employer"—rather than "any non-essential employer" or "any employer other than those deemed essential"—and, therefore, is not limited to businesses deemed non-essential by qualifying orders). This argument is true so far as it goes, but it does not address the issue at hand. The ERC is not available to just "any employer"; rather, the claimed tax credit is available to "any employer" that suffers a suspension of business "due to" a qualifying order. The Court must give meaning to the terms the statute uses to *qualify* "any employer," and—as discussed *supra*—those words lead to the conclusion that NEHS did not suffer any suspensions "due to" Order No. 13, as it was exempted from the governor's mandate.

Next, NEHS was not required to adhere to the standards in the DPH guidance promulgated under the May 28, 2021 modified declaration of public health emergency. Those standards were expressly permissive. *See* ECF 21-1 at 122–26 (beginning each standard by explaining that "[h]ealth care providers *should* . . . " (emphasis added)); ECF 21-1 at 127–31 (same); *see also CGS-ASP Sec., JV, LLC v. United States*, 162 Fed. Cl. 783, 805 n.4 (2022) ("'Should' sometimes is substituted for 'may' as a permissive word." (citing *Union Elec. Co. v. Consolidation Coal Co.*, 188 F.3d 998, 1001 (8th Cir. 1999))), *appeal dismissed*, No. 23-1471, 2024 WL 4003396 (Fed. Cir. Aug. 30, 2024) (mem.). NEHS's assertion that "noncompliance" with the individual instructions in the DPH guidance "risked enforcement action and loss of licensure," ECF 21 at 22, is unsupported by evidence and at odds with the unambiguously permissive language in the guidance. Contrary to NEHS's assertion that this interpretation would "create a regulatory vacuum," *see* ECF 24 at 15, NEHS was still subject to other DPH regulations and safety standards as a licensed mental health care clinic. *See generally* 105 MASS. CODE REGS. § 140.001–1300 (2025)

(setting forth "standards for the maintenance and operation of clinics" in Massachusetts).[30]

In sum and substance, none of the qualifying orders cited by NEHS as causing the first category of disruptions required NEHS to do anything, as they expressly exempted NEHS from compliance or otherwise gave NEHS permission not to follow them. To the extent NEHS complied with those orders, it did so voluntarily, and no reasonable factfinder could conclude that the resulting suspensions were "due to" the qualifying government orders. Under any exacting standard of proximate cause, "there always lurks the idea of responsibility . . . ." RESTATEMENT (SECOND) OF TORTS § 431 cmt. A (2025). Because NEHS was not required to follow the regulations at issue, the Court cannot find those regulations responsible for NEHS's conduct to the extent necessary to conclude they were a proximate cause of any allegedly qualifying suspensions. *Cf. In re JSmith*, 674 B.R. at 216 (holding construction company could not "rely on [an order] as a governmental order to justify its suspension of operations under Section 2301" of the CARES Act where "[t]he entire category of construction work was specifically exempted" from the order); *Stenson Tamaddon*, 2025 WL 1725942, at *9 ("[T]he most obvious and natural interpretation of the [relevant] language in the ERC statute" is that "[a] business voluntarily suspending its own operations has not been suspended *due to orders from an appropriate governmental authority* but rather has suspended operations of its own volition." (emphasis in original)).

For the second category of suspensions, NEHS argues its inability to "expand[] its operations through new clinic openings" was caused by DPH's suspension of in-person inspections for new clinics "[i]n response to the COVID-19 public health emergency and the closure of non-essential businesses in COVID-19 Order No. 13." ECF 21 at 25. Yet NEHS does not tie these disruptions to qualifying orders. NEHS does not point to—and the Court has not identified—any provision in any qualifying order that required DPH to suspend or otherwise limit in-person inspections of planned clinics. In fact, the list of "COVID-19 Essential Services" suggests that the qualifying orders expressed a willingness—if not an authorization—for inspections to continue. Order No. 13 designated "[c]onstruction [w]orkers who support the . . . *inspection* . . . of construction sites and construction projects" as "COVID-19 Essential Services." ECF 21-1 at 32 (emphasis added). Therefore, to the extent DPH delayed inspections and approval of NEHS's construction plans, NEHS has not identified any evidence that such delay was attributable to qualifying orders.

Although NEHS points to the "stark" contrast between "clinic openings during the period of governmental orders and the period immediately following" as evidence

---

[30] To the extent NEHS alleges that it faced qualifying suspensions that were due to regulations and safety standards issued under DPH's general authority to supervise the maintenance and operation of clinics in Massachusetts, those suspensions would not have entitled NEHS to the ERC because they were not promulgated "due to [COVID-19]." 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

20

that the orders were the direct cause of the delay, ECF 21 at 26, that contrast cannot, on its own, prove that the delays were caused by qualifying government orders. NEHS's reduced expansion rate may well have resulted from general pandemic conditions, economic uncertainty, government inaction having nothing to do with qualifying government orders, or any number of other confounding variables. Under these circumstances, the identified correlation is not evidence of causation. *See In re JSmith*, 674 B.R. at 218 ("[W]hile there is no doubt various delays, quarantines, sicknesses, and other disruptions occurred, general pandemic conditions caused those closures, not shut down orders. Under the ERC, however, only businesses whose operations were suspended *due to* a qualifying governmental order qualify for credit." (emphasis added)).

Finally, NEHS fails to show that the third category of suspensions was directly caused by any of the qualifying orders for largely the same reason: the disruptions were not directly attributable to the qualifying orders. NEHS asserts that the "forced transition to telehealth" reduced its capacity to supervise its non-independently licensed clinicians, imposed significant operational burdens, and "impaired its ability to provide and bill for services . . . ." ECF 21 at 26–27. But, as discussed *supra*, the qualifying orders did not force NEHS to transition to telehealth. NEHS also points to school and childcare closures during the early stages of the pandemic,[31] explaining that they "directly limited NEHS's operational capacity by reducing clinician availability." ECF 21 at 27. Relatedly, NEHS maintains that delays in licensing, onboarding, and credentialing clinicians "were exacerbated by COVID-19–related disruptions affecting licensing boards, insurers, and administrative processing." *Id.* Again, though, "[t]he causal chain between the orders and the reason for the [delays] is too attenuated to meet the definition of 'due to' . . . ." *JPM Rest.*, 2026 WL 561147, at *9. Pointing to "COVID-19–related disruptions" is insufficient to qualify a business as an eligible employer under the suspension-of-business prong. Other factors—such as increased rates of illness among employees and government officials, the need for affected employees to quarantine until asymptomatic, and general uncertainty about the safety and efficacy of returning to work—could have, and likely did, contribute to the administrative delays and decreases in employee productivity that NEHS endured.

In short, to qualify for the ERC, businesses must show that a qualifying order directly caused the full or partial suspension. NEHS has not demonstrated that a reasonable factfinder could conclude that this was the case for any of its assertedly qualifying suspensions. Accordingly, the Court must end its inquiry there and grant summary judgment in the government's favor.

---

[31] *See supra* note 10.

\*       \*       \*

The Court is sympathetic to NEHS's plight.  To say that the COVID-19 pandemic presented difficult decisions to the nation, its citizens, and businesses looking to navigate their way through times of great uncertainty would be an understatement.  In the face of the unpredictable and dangerous public health emergency, state and local governments employed complex and, at times, difficult measures meant to combat the spread of disease and limit the unprecedented strain on the economy.  Erring on the side of caution in the face of those measures was a commendable course of action, and Congress provided significant, widely available relief to businesses who did so involuntarily or at the cost of their bottom line.  But that relief was not unlimited.  Where Congress restricts the availability of certain relief—however significant and remedial the relief is intended to be—the Court is bound to observe those restrictions.  Here, Congress placed clear limits on the availability of the ERC.  Because the disruptions to NEHS's business fell outside the bounds of those limits, NEHS is not entitled to the tax credit.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment (ECF 21) is **DENIED**, and defendant's cross-motion for summary judgment (ECF 23) is **GRANTED**.  The Clerk of Court is directed to **ENTER** judgment accordingly.  No costs.

It is so **ORDERED**.

Armando O. Bonilla
Judge

22